IAG5holP

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

              v.                             18 Cr. 36 (JPO)

CYNTHIA HOLDER,

                    Defendant.

------------------------------x

                                             October 16, 2018
                                             12:35 p.m.

Before:

                    HON. J. PAUL OETKEN,

                                             District Judge


                         APPEARANCES

GEOFFREY S. BERMAN
      United States Attorney for the
      Southern District of New York
BY:   AMANDA K. KRAMER
      Assistant United States Attorneys

THOMPSON HINE, LLP (NYC)
      Attorneys for Defendant
BY: NORMAN A. BLOCH
      EMILY J. MATHIEU

IAG5holP

1              (Case called)

2              THE DEPUTY CLERK:  Starting with the government

3    counsel, please state your name for the record.

4              MS. KRAMER:  Good afternoon, your Honor.  Amanda

5    Kramer for the government.

6              THE COURT:  Good afternoon.

7              MR. BLOCH:  Norman Bloch and Emily Mathieu for

8    Ms. Holder.

9              THE COURT:  Good afternoon.

10             MR. BLOCH:  Good afternoon, your Honor.

11             THE COURT:  I have been informed, Ms. Holder, that you

12   wish to plead guilty to Counts One, Two, Four and Five of the

13   indictment; is that correct?

14             THE DEFENDANT:  Yes, your Honor.

15             THE COURT:  You can remain seated.  I will have you

16   stand in a minute briefly when I swear you in.  Before

17   accepting your plea I will ask you a number of questions, and

18   the reason for that is to establish, to my satisfaction, that

19   you wish to plead guilty because are you in fact guilty and not

20   for some other reason.  If at any point you don't understand

21   any of my questions, or you would like a further opportunity to

22   speak with your lawyer, please, let me know.  All right?

23             THE DEFENDANT:  Thank you, your Honor.

24             THE COURT:  Please place the defendant under oath.

25             THE DEPUTY CLERK:  Will you please stand, raise your

IAG5holP

1    right hand?

2                 (Defendant sworn)

3                 THE COURT:  You may remain seated.

4                 You are now under oath and that means if you answer

5    any of my questions falsely, your answers could be used in a

6    prosecution for perjury.

7                 Do you understand that?

8                 THE DEFENDANT:  Yes, your Honor.

9                 THE COURT:  Please tell me your full name.

10                THE DEFENDANT:  Cynthia Anne Holder, and that is Anne

11   with an E.

12                THE COURT:  How old are you?

13                THE DEFENDANT:  52 years old, sir.

14                THE COURT:  How far did you go in school.

15                THE DEFENDANT:  I received a bachelors degree from the

16   University of Houston.

17                THE COURT:  And have you ever been treated or

18   hospitalized for any mental illness?

19                THE DEFENDANT:  No, your Honor.

20                THE COURT:  Are you now or have you recently been

21   under the care of a psychiatrist or a doctor?

22                THE DEFENDANT:  No, your Honor.

23                THE COURT:  And have you ever been hospitalized or

24   treated for addiction to drugs or alcohol?

25                THE DEFENDANT:  No, your Honor.

IAG5holP

| | |
|---|---|
| 1 | THE COURT:  In the past 24 hours, have you taken any |
| 2 | drugs, medicine, or alcohol? |
| 3 | THE DEFENDANT:  No, sir.  I have not. |
| 4 | THE COURT:  And is your mind clear today? |
| 5 | THE DEFENDANT:  Yes, sir. |
| 6 | THE COURT:  You understand what is happening in this |
| 7 | proceeding? |
| 8 | THE DEFENDANT:  Yes, sir.  I do. |
| 9 | THE COURT:  Does either counsel have any doubt as to |
| 10 | the defendant's competence to plead? |
| 11 | MS. KRAMER:  No, your Honor. |
| 12 | MR. BLOCH:  No, your Honor. |
| 13 | THE COURT:  Based on her responses to my questions and |
| 14 | her demeanor as I observe it, I find that the defendant is |
| 15 | competent to enter a plea of guilty at this time. |
| 16 | Ms. Holder, have you had a sufficient opportunity to |
| 17 | discuss your case with your lawyer including the specific |
| 18 | charges you intend to plead guilty to, as well as any possible |
| 19 | defenses and the consequences of pleading guilty? |
| 20 | THE DEFENDANT:  Yes, I have, your Honor. |
| 21 | THE COURT:  And are you satisfied with your attorney's |
| 22 | representation of you? |
| 23 | THE DEFENDANT:  Yes, sir.  I am. |
| 24 | THE COURT:  I am now going to explain certain |
| 25 | constitutional rights that you have.  These are rights that you |

IAG5holP

1     give up when you plead guilty, and therefore I want to make

2     sure you understand what those rights are.

3             Under the Constitution and laws of the United States

4     you are entitled to a speedy and public trial by a jury on the

5     charges contained in the indictment.

6             Do you understand that?

7             THE DEFENDANT:  Yes, sir.

8             THE COURT:  And at that trial you will be presumed

9     innocent and the government would be required to prove you

10    guilty by competent evidence and beyond a reasonable doubt

11    before you could be found guilty.  You would not have to prove

12    that you were innocent.  A jury of 12 people would have to

13    agree unanimously that you were guilty.

14            Do you understand that?

15            THE DEFENDANT:  Yes, your Honor.

16            THE COURT:  At that trial and at every stage of your

17    case you would have the right to be represented by an attorney

18    and if you could not afford an attorney, one would be appointed

19    to represent you.

20            Do you understand that?

21            THE DEFENDANT:  Yes, sir.  I do.

22            THE COURT:  During a trial, the witnesses for the

23    government would have to come to court and testify in your

24    presence, and your lawyer would be able to cross-examine the

25    witnesses for the government, object to evidence offered by the

IAG5holP

1   government and, if you wish, issue subpoenas and offer evidence

2   and compel witnesses to testify in your defense.

3          Do you understand that?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  At a trial, although you would have the

6   right to testify if you chose to, you would also have the right

7   not to testify, and no suggestion or inference of guilt could

8   be drawn from the fact that you did not testify if that is what

9   you chose.

10          Do you understand that?

11          THE DEFENDANT:  Yes, your Honor.

12          THE COURT:  If you were convicted at a trial, you

13   would also have the right to appeal that verdict.

14          Do you understand that?

15          THE DEFENDANT:  Yes, sir, I do.

16          THE COURT:  Even at this time, as you are entering

17   this plea, you do have the right to change your mind, plead not

18   guilty, and go to trial.

19          Do you understand that?

20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  If you do plead guilty and I accept your

22   plea, you will be giving up your right to a trial and the other

23   rights that I have just described, there will be no trial, but

24   rather, I will enter a judgment of guilty on these counts which

25   will be a conviction on those counts and that I will sentence

IAG5holP

1    you simply on the basis of your guilty plea on that conviction

2    based on the guilty plea.  I will not sentence you now but I

3    will sentence you in several months from now after receiving a

4    presentence report that the Probation Department will prepare,

5    as well as any written submissions from your lawyer and from

6    the government's counsel.

7              Do you understand that?

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  And, if you plead guilty, you will also

10   have to give up your right not to incriminate yourself because

11   in a few minutes I will ask you about what you did to satisfy

12   myself that you are in fact guilty as charged.

13             Do you understand that?

14             THE DEFENDANT:  Yes, your Honor.

15             THE COURT:  Have you received a copy of the indictment

16   containing the charges against you in this case?

17             THE DEFENDANT:  Yes, sir.  I have.

18             THE COURT:  Have you read it and discussed it with

19   your lawyer?

20             THE DEFENDANT:  Yes, your Honor.

21             THE COURT:  Do you understand the charges against you?

22             THE DEFENDANT:  I do, your Honor.

23             THE COURT:  Ms. Kramer, would the government like to

24   state what the elements are of these offenses?

25             MS. KRAMER:  Certainly, your Honor.

IAG5hol P

1          The defendant is charged in Counts One, Two, Four and

2     Five of the indictment, and the government is prepared to prove

3     the following elements at trial.

4          First, for Count One, which charges the defendant with

5     conspiring to defraud the United States, the government would

6     prove the following elements:  First, that the defendant

7     entered into an agreement; second, that the object of the

8     agreement was to obstruct a lawful function of the government

9     by deceitful or dishonest means; and third, that at least one

10    overt act was committed in furtherance of that agreement.

11         Count Two charges the defendant with conspiring to

12    commit wire fraud in violation of Title 18, United States Code,

13    Section 1349.  There are two elements of this offense that the

14    government is prepared to prove.  First, that two or more

15    persons entered into a conspiracy to commit wire fraud, the

16    elements of which I will explain in a moment; and second, that

17    the defendant knowingly and willfully became a member of the

18    conspiracy.

19         Counts Four and Five each charge the defendant with

20    the substantive offense of wire fraud.  The elements of wire

21    fraud which the government would prove beyond a reasonable

22    doubt are, first, that there was a scheme or artifice to

23    defraud or to obtain money or property by materially false and

24    fraudulent pretenses, representations, or promises; and second,

25    that the defendant knowingly and willfully participated in the

IAG5holP

1   scheme or artifice to defraud with knowledge of its fraudulent

2   nature and with specific intent to defraud.  Finally, third,

3   that an execution of that scheme the defendant used or caused

4   the use of interstate wire.

5        The government would also prove at trial, by a

6   preponderance of the evidence, that at least one act in

7   furtherance of each offense was committed in the Southern

8   District of New York.

9        THE COURT:  Would you also like to make a factual

10  proffer as to what the government would prove if there were a

11  trial?

12       MS. KRAMER:  Certainly, your Honor.

13       The government would prove that first, with respect to

14  both conspiracy counts, that in or about April 2015 the

15  defendant agreed, with others, to participate in a scheme to

16  misappropriate and utilize important valuable confidential

17  information from the Public Company Accounting Oversight Board,

18  also known as the PCAOB.  That valuable confidential

19  information consisted of the identity of the engagements, the

20  public issuers that KPMG -- the accounting firm -- had audited

21  and that the PCAOB intended to inspect as part of its annual

22  inspection process.  The PCAOB's inspection process and the

23  reports that are generated from that inspection process

24  annually are transmitted to and utilized and relied upon by the

25  United States Securities and Exchange Commission -- the SEC --

IAG5holP

1    in carrying out various functions including regulatory and

2    enforcement matters.

3              The defendants entered into an agreement to

4    misappropriate this confidential information for KPMG's benefit

5    and to utilize it to improve KPMG's inspection results which

6    would better position KPMG both with respect to the PCAOB and

7    with the SEC which was regularly communicating with KPMG about

8    its performance which was something that KPMG and the

9    defendants in this case were well aware of as the government

10   would prove at trial.  The defendants entered into this

11   unlawful scheme and the conspiracy continued from approximately

12   April 2015 through in or about February 2017, when certain

13   individuals at KPMG learned about the defendants' schemes.

14             The government would prove at trial all of the

15   foregoing through various types of evidence including witness

16   testimony from individuals from KPMG, from the SEC, from the

17   PCAOB, among others, and through various documents including

18   text messages and e-mails that were exchanged among and between

19   the defendants in the case, some of whom were in Manhattan and

20   the Southern District of New York at the time that the wires

21   were used and almost all of which constituted the use of

22   interstate wires because there were text messages and e-mails

23   that were sent across state lines.

24             As part of the defendants' scheme, beginning in about

25   April 2015, a confidential, valuable list of the issuers that

IAG5holP

1    were audited by KPMG and that were to be inspected in 2015 was

2    taken from the PCAOB and was shared with and utilized by

3    defendants who were employed by KPMG at the time.  That has

4    been known, as we have discussed in other submissions in this

5    case, as the 2015 list.  That list was provided and utilized in

6    response to a request by individuals employed by KPMG at the

7    time who then utilized that information, took specific actions

8    upon it with an eye to improving KPMG's inspection results, and

9    therefore its standing both with PCAOB and with the SEC.

10          Again, in 2016, the partial list of the engagements to

11   be inspected by the PCAOB was misappropriated from the PCAOB,

12   was shared with individuals at KPMG based on a request for such

13   confidential information, a request that was ongoing from 2015

14   forward conveyed both by words and in actions, and KPMG

15   employees who are defendants in this case utilized that

16   confidential misappropriated PCAOB information in an attempt to

17   improve KPMG's inspection results to improve its standing with

18   the SEC and, among other things, actions that were taken with

19   respect to the 2016 list included what was referred to as a

20   stealth re-review of accounting work papers where efforts were

21   taken to conceal the fact that confidential information had

22   been obtained from individuals other than those who were a part

23   of the conspiracy, and the accounting work papers, the auditing

24   work papers that the PCAOB inspectors would be looking at and

25   examining were re-reviewed with an eye to improving them to

IAG5holP

possibly affect KPMG's inspection performance and therefore its

standing with PCAOB and with the SEC.

Again, in 2017, this time an entire list of the

inspections that were to take place in 2017 was illegally

misappropriated from the PCAOB and utilized by individuals at

KPMG to improve KPMG's inspection results and therefore its

standing with the PCAOB and the SEC.  Among other things,

certain engagement partners, individuals responsible for the

particular audits that were to be the subject of the PCAOB

inspection, were informed of the fact that they had been chosen

for inspection and were informed so early that in addition to

being able to do the type of work paper re-review that was

illegally done in 2016, at this point it was possible to have

more of an effect even on the audits because the audit opinions

had not been issued and the audit work had not been complete

and the scheme was thwarted only because other individuals at

KPMG learned of it and stopped further action by the defendants

in this case.

THE COURT:  Thank you.

Ms. Holder, I also want to explain the maximum

penalties for these counts.  Each of the four counts has a

maximum under the statute -- we will get to the guidelines in a

minute -- which is separate, but under the statute, Count One,

conspiracy to defraud the United States, carries a maximum of

five years' imprisonment, there is a maximum fine of the

IAG5holP

greatest of $250,000 or two times the total gain from the

offense or two times the total loss to others from the offense,

and a $100 special assessment, and there is a maximum term of

supervised release of three years.  When I say supervised

release that means that you are subject to monitoring following

a release from any term of imprisonment and there are terms and

conditions of supervised release that you must comply with,

essentially like being on probation, and if you fail to comply

with them you can be returned to prison without a jury trial.

Count Two, conspiracy to commit wire fraud carries a

maximum 20 years' imprisonment, a maximum fine of the greatest

of $250,000, or two times the total gain from the offense or

two times the total loss to others from the offense, and a $100

special assessment, and a maximum term of supervised release of

three years.

Counts Four and Five, which both charge wire fraud,

carry a maximum of 20 years' imprisonment and a maximum fine of

the greatest of $250,000 or two times the total loss to others

from the offense or gain to the defendant from the offense, and

a $100 special assessment, as well as a maximum term of

supervised release of three years.

Ms. Holder, are you a United States citizen?

THE DEFENDANT:  Yes, your Honor.  I am.

THE COURT:  Also, if your attorney or anyone has

attempted to predict what your sentence will be, I want to

IAG5holP

1    explain to you that no one can promise you or assure you what

2    your sentence will be, not the government or your attorney or

3    anyone else, because I'm the one who is going to determine your

4    sentence.  Again, not now, but only after receiving the

5    presentence report and any written submissions that I received

6    prior to sentencing, and I will consider any departures or

7    variances from the Sentencing Guidelines after considering the

8    Guidelines themselves, and then ultimately determine what an

9    appropriate sentence for you is under the factors in the

10   statute known as 18 U.S.C. 3553(a).

11           Have you had a chance to discuss sentencing with your

12   attorney?

13           THE DEFENDANT:  Yes, your Honor.  I have.

14           THE COURT:  Do you understand that even if your

15   sentence is different from what anyone has told you or what you

16   expect, you will still be bound by your guilty plea and will

17   not be allowed to withdraw your plea of guilty?

18           THE DEFENDANT:  I do understand, that, your Honor.

19           THE COURT:  Has anyone threatened you in any way or

20   forced you to plead guilty?

21           THE DEFENDANT:  No, your Honor.  They have not.

22           THE COURT:  You have not signed a plea agreement with

23   the government; is that correct?

24           THE DEFENDANT:  No, your Honor.  I have not.

25           THE COURT:  There is a letter that I have a copy of

IAG5holP

dated October 5 which is called a Pimentel letter which sets

forth the government's current view of what the guideline range

would be in this case.  Have you received a copy of that

Pimentel letter?

            THE DEFENDANT:  Yes, your Honor.  I have.

            THE COURT:  You have had a chance to read it and

discuss it with your lawyer?

            THE DEFENDANT:  I have, your Honor.

            THE COURT:  Under the Pimentel letter, which is not a

binding agreement but it is the government's current view of

what the guideline range is, the letter states that the

guideline range is 41 months to 51 months' imprisonment and

there is a guideline fine range of $15,000 to $150,000.  This

is the government's current view of the guideline range and it

is not binding on the government and that guideline calculation

is also not binding on me, I will make my own determination of

the guidelines as well as considering the guidelines as well as

any departures or possible variances from them.

            Do you understand that?

            THE DEFENDANT:  Yes, your Honor.

            THE COURT:  Having gone through this colloquy, do you

still wish to plead guilty?

            THE DEFENDANT:  I do, your Honor.

            THE COURT:  Okay.

            Would you please tell me, in your own words, what you

IAG5holP

1   did that makes you believe you are guilty of these charges?

2            THE DEFENDANT:  Yes.  May I read it?

3            THE COURT:  You may read it as long as you read it

4   slowly so the court reporter can take it down.

5            THE DEFENDANT:  Thank you, your Honor.

6            I am a certified public accountant.  I joined the

7   PCAOB as an inspector in 2011.  When I subsequently was

8   assigned to inspect KPMG audits, Brian Sweet was one of my

9   supervisors.  Also, while employed at the PCAOB, I became

10  friends with a PCAOB co-worker, Jeff Wada.  I was aware that

11  Mr. Sweet, Mr. Wada, and I had a duty not to disclose

12  confidential PCAOB information to outsiders.  I was also aware

13  that the PCAOB was subject to oversight by the SEC and that the

14  annual reports of the PCAOB's inspections of KPMG's audits were

15  provided by the PCAOB to the SEC for potential use in its

16  regulatory activities.

17           In May 2015, Mr. Sweet left the PCAOB and became a

18  partner at KPMG.  Later in May 2015, at Mr. Sweet's request

19  while I was still employed at the PCAOB and Mr. Sweet was a

20  KPMG partner, I transmitted to him, via e-mail, a confidential

21  PCAOB document.  When Mr. Sweet left the PCAOB and became a

22  partner at KPMG in May 2015, I did not know that he had taken

23  with him a confidential list of KPMG audits which the PCAOB was

24  to inspect later in 2015.

25           In August 2015, I was hired by KPMG as an employee

IAG5holP

with the title of executive director.  Mr. Sweet was one of my

supervisors at the firm.

In March 2016, during an interstate telephone

conversation, Mr. Wada provided to me a partial list of KPMG

audits which the PCAOB was to inspect later in 2016.  At the

time, I was aware that the information was confidential.  I, in

turn, shared with Mr. Sweet, the confidential information

Mr. Wada provided to me.  I was subsequently instructed by

Mr. Sweet to participate with him and others in reviews of

certain of the audit work papers supporting the KPMG audits

identified by Mr. Wada before those audits and work papers were

inspected by the PCAOB later in 2016.  I understood that the

purpose of the review was to evaluate certain audit procedures

and to improve their documentation in order to improve KPMG's

results on the PCAOB's 2016 inspections of the designated KPMG

audits.

In February 2017, during an interstate telephone

conversation, Mr. Wada provided to me a list of KPMG audits

which the PCAOB was to inspect later in 2017.  At the time, I

was aware that the information was confidential.  I again

shared with Mr. Sweet the confidential information Mr. Wada

provided to me so that KPMG could use the information to

improve its 2017 inspection results.

Some of the conduct I have just described took place

in Manhattan, in the Southern District of New York.

IAG5holP

1      I knew that my actions were wrong at the time I took

2  them.  I deeply regret my actions and I accept full

3  responsibility for my conduct.

4           THE COURT:  Thank you.

5           Ms. Kramer, does the government believe there is a

6  sufficient factual predicate for the guilty plea or do you

7  believe there is any further inquiry necessary?

8           MS. KRAMER:  Your Honor, only that I think it would be

9  helpful to inquire that the defendant knew -- withdraw that.

10          It would be helpful to inquire that the defendant,

11  when sharing the confidential information with Mr. Sweet in

12  2016 and 2017, intended that the information would be utilized.

13          THE COURT:  Ms. Holder, when you did share the

14  information with Mr. Sweet in 2016 and 2017, was it your

15  understanding that the information would be utilized by KPMG?

16          THE DEFENDANT:  When I shared it in 2016 I was not,

17  but in 2017 I was.

18          THE COURT:  So, in 2016 you shared the information --

19          THE DEFENDANT:  Yes.

20          THE COURT:  -- but you didn't -- you weren't aware

21  that it would be utilized.

22          THE DEFENDANT:  I shared it with Brian -- or Mr. Sweet

23  and I explained -- I told him at the time I had heard this I

24  was not comfortable with the information and I passed it down

25  and I didn't know what he was going to do with the information

IAG5holP

1    or if he was going to -- I did not know at that time.  But, I

2    certainly understand it now, your Honor.

3            THE COURT:  Did you realize there was a significant

4    likelihood that he might use it?

5            MS. KRAMER:  Yes, sir.  I knew he could.

6            THE COURT:  Okay.

7            MR. BLOCH:  May I have one moment, your Honor?

8            THE COURT:  Yes.

9            (Defendant and counsel conferring)

10           THE DEFENDANT:  And I did, your Honor, as I stated,

11   participate in the reviews in which the information was

12   utilized.

13           THE COURT:  When was that?

14           THE DEFENDANT:  2016.

15           THE COURT:  In 2016.

16           Do counsel think there is any additional inquiry

17   necessary?

18           MS. KRAMER:  No, your Honor.  I think the government

19   would prove at trial that the defendant intended that the

20   information would be utilized even if she could not foresee

21   exactly how specifically it would be utilized by KPMG but that

22   the purpose of the sharing was that the information would then

23   be used.  So, there is no additional factual inquiry that the

24   government would like, your Honor.

25           THE COURT:  Okay.

IAG5holP

1          Mr. Bloch, anything you want to add?

2          MR. BLOCH:  No, your Honor.

3          THE COURT:  Let me ask counsel if you believe there is

4     sufficient factual predicate for the plea.

5          MS. KRAMER:  Yes, your Honor.

6          MR. BLOCH:  Yes, your Honor.

7          THE COURT:  And, Mr. Bloch, do you know of any valid

8     defense that would prevail at trial, or any reason why your

9     client should not be permitted to plead guilty at this time?

10         MR. BLOCH:  No, your Honor.

11         THE COURT:  Ms. Holder, since you acknowledge that you

12    are in fact guilty as charged in the indictment and since I am

13    satisfied that you know your rights including your right to go

14    to trial, that you are aware of the consequences of your plea

15    including the sentence which may be imposed, I find that you

16    are voluntarily and knowingly pleading guilty and I accept your

17    guilty plea and enter judgment of guilty on the counts to which

18    you have pleaded guilty which is Counts One, Two, Four and Five

19    of the indictment.

20         Now we will turn to sentencing.  I will set a date for

21    sentencing.  I mentioned the presentence report.  There will be

22    an opportunity to have an interview with the probation officer

23    who is preparing the presentence report.  Your counsel will be

24    able to be present with you.  Anything you do speak about,

25    please make sure you are honest and accurate.  Sometimes people

IAG5holP

1    say things that aren't true and that can have a negative effect

2    at the time of sentencing.

3            In terms of timing, we normally set sentencing out

4    about three to four months.  Do you have a request?

5            MR. BLOCH:  Yes, your Honor.

6            I would ask that sentencing be put off until after the

7    trial that is scheduled on February 11th.  I have conferred

8    with Ms. Kramer and subject, of course, to the Court's

9    approval, I would ask for April 5 as a sentence date; of '19.

10           THE COURT:  Is that fine with the government?

11           MS. KRAMER:  That's fine with the government, your

12   Honor.

13           THE COURT:  That's fine.  You said April 5?

14           MR. BLOCH:  Yes, your Honor.

15           THE COURT:  Do you prefer morning or afternoon?  I

16   could do either.  Is either more convenient?

17           MR. BLOCH:  Morning, your Honor.

18           THE COURT:  Okay.  10:30 in the morning?

19           MR. BLOCH:  That's fine.

20           THE COURT:  10:30, on April 5, 2019, will be the date

21   for sentencing.  Any written submissions will be due two weeks

22   before that for the defendant, and one week before that for the

23   government.

24           Any objection to the present bail conditions being

25   continued to the date of sentence?

IAG5holP

1            MS. KRAMER:  No, your Honor.

2            THE COURT:  Ms. Holder, the conditions of your

3    pretrial release will continue to apply until the date of

4    sentence so make sure you continue to comply with those

5    conditions.

6            THE DEFENDANT:  Yes, your Honor.

7            THE COURT:  And, you must be in the courtroom at the

8    time I have set for sentencing.  It is a separate crime if you

9    don't show up for sentencing so please make sure you are here

10   for sentencing.

11           THE DEFENDANT:  Yes, your Honor.

12           THE COURT:  Anything further?

13           MS. KRAMER:  No, your Honor.  Thank you.

14           MR. BLOCH:  No, your Honor.  Thank you.

15           THE COURT:  Thank you very much.  We are adjourned.

16                              o0o

17

18

19

20

21

22

23

24

25