# EXHIBIT 21



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 4, 2019

<u>**BY EMAIL**</u>

Sara K. Willette
United States Probation Officer
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

      Re:   <u>**United States v. David Middendorf, et al.,**</u>
            **18 Cr. 36 (JPO)**

Dear Officer Willette:

The Government writes in response to the objections of Cynthia Holder to the pre-sentence report. Cynthia Holder's objections are listed below; the Government's responses are listed in bold.

7. The following sentence should be added at the end of the paragraph: "However, forfeiture is not warranted with respect to Ms. Holder because she derived no personal financial benefit from the offenses."

**Although the Government does not believe this sentence is necessary, the Government is not seeking forfeiture from Ms. Holder.**

9.n. The word "stipulated" should be replaced by the word "estimated." No guideline range was stipulated with the government.

**The Government has no objection to this change.**

19. The last sentence of this paragraph should read as follows: "PCAOB Ethics Rule 9 imposes a lifetime prohibition on current or former PCAOB employees disclosing to outsiders confidential PCAOB information obtained in the course and scope of their employment. This may include non-public information about which audits have been selected for inspection."

**The Government has no objection to this change, with the following caveat: the last sentence should read: "This includes non-public information about which audits have been selected for inspection." (*See* Tr. 1701).**

21. At the end of the second sentence, add "and one of HOLDER's bosses at the

PCAOB."

**The Government objects to this change.  Sweet was an associate director in the inspections group, assigned to the KPMG audits.  Although this position was higher than Holder's position as an inspections leader, Holder did not directly report to Sweet while at the PCAOB.**

22. At the end of line 3, the date should be August 3, 2015, not August 1, 2015.

**The Government has no objection to this change.**

30. This paragraph is inaccurate because, among other things, unbeknownst to Ms. Holder in April 2015, when Mr. Sweet left the PCAOB, he had surreptitiously taken the 2015 KPMG inspection list with him, so there would be no reason for Ms. Holder to disclose to Mr. Sweet "likely inspection selections" while Ms. Holder was still employed at the PCAOB. The paragraph should read as follows:

"In the four months after Sweet left the PCAOB and before HOLDER joined KPMG, Sweet remained in communication with HOLDER, including about helping HOLDER find employment at KPMG. HOLDER and Sweet occasionally discussed confidential PCAOB information during that period. Also during that period, at Sweet's request, HOLDER emailed to Sweet a copy of a draft of Part II of a PCAOB KPMG inspection report on which Sweet had worked when he was at the PCAOB. Prior to leaving the PCAOB, HOLDER took with her PCAOB confidential information copied onto a portable electronic device."

**The Government has no objection to this change.**

31. The last part of line four of this paragraph should read: "including, in March 2016, a partial list of ...." Lines 7-8 of the paragraph should read: "BRITT, MIDDENDORF, WHITTLE, BRITT and Sweet agreed to initiate re-reviews of audits on the partial PCAOB 2016 list. Sweet directed HOLDER and others to conduct the re-reviews and supervised their work." At the end of the last sentence of the paragraph, the phrase "that was not properly documented" should be deleted.

**The Government has no objection to this change.**

32. With respect to the second sentence of this paragraph, please see the sixth paragraph of Ms. Holder's statement reported in paragraph 47 of the initial PSR. On line 7 of this paragraph, the phrase "along with the inspections' focus areas" should be deleted.

**The Government objects to this change, since the trial testimony established that Wada shared focus areas for certain inspections.  (*See* Tr. 1031-36).  The Government proposes that the relevant phrase say "certain inspections' focus areas."**

34. This paragraph should read as follows:

"Prior to speaking with OGC, Sweet contacted HOLDER, advised her that he had been contacted by OGC and discussed with HOLDER what to say. In order to protect Wada's identity as the source of the list, Sweet and HOLDER agreed that they would falsely tell OGC in substance that HOLDER received the list anonymously through the mail."

**The Government objects to this change. Consistent with the trial testimony (Tr. 1076-77, 1087-88), the Government requests that the paragraph state as follows:**

**Prior to speaking to the OGC, Holder told Sweet that Holder intended to lie and tell OGC that Holder had received the list of ticker symbols for the 2017 inspection selections anonymously in the mail. Holder further said that she would not tell them that Wada was the source of the information. Sweet told Holder that he would do the same. Holder also later counseled Sweet on how to handle questioning from KPMG lawyers.**

35. The word "falsely" should be deleted from the last line of this paragraph and the following sentence should be added at the end of the paragraph: "With respect to both of the lists orally provided to Ms. Holder by Mr. Wada in late March 2016 and early February 2017, each time, Ms. Holder shredded her handwritten lists shortly after promptly providing the information to Mr. Sweet."

**The Government has no objection to this change.**

36. The portion of this paragraph following the first two sentences is inaccurate. The full paragraph should read as follows:

"Shortly thereafter, HOLDER contacted Sweet and told him that HOLDER had become aware that OGC was monitoring their email communications. Sweet worried that Sweet had saved confidential PCAOB information to Sweet's KPMG computer. Well before the OGC investigation began, HOLDER had advised Sweet that it was a mistake to have saved confidential PCAOB information to Sweet's KPMG computer. After the OGC investigation began, HOLDER neither advised Sweet to delete any information from his KPMG computer nor advised him to delete any email correspondence concerning confidential PCAOB information she had sent him. To the contrary, HOLDER retained all of the relevant email correspondence and subsequently provided it to counsel for the PCAOB and KPMG, and also retained at her home all confidential PCAOB information she had taken when she left the PCAOB."

**The Government objects to this change, since the trial testimony established that Holder advised Sweet to delete certain illicit information from his KPMG computer, but not all of it. (Tr. 1159).**

37. The second sentence of this paragraph is not accurate. See Middendorf-Wada Trial Transcript at 3365 (Government's Rebuttal Summation) and the eighth paragraph of Ms. Holder's statement and the accompanying footnote, reported in paragraph 47 of the initial PSR. The third sentence of this paragraph also is not accurate because Ms. Holder did not falsely advise Mr. Sweet that she had deleted all of her communications with Mr. Wada and she did not direct Mr. Sweet to delete any of his text messages concerning Mr. Wada.

**The Government proposes that the second sentence state: "In response, Holder deleted certain incriminating text messages with Wada, such as the text messages regarding the grocery list." The Government has no objection to deleting the last sentence.**

38. This paragraph should read as follows:

"In a further effort to hide their ongoing communications, Sweet suggested that he and HOLDER obtain 'burner telephones,' that is, prepaid cellular telephones that could not be traced to HOLDER or Sweet. Sweet also suggested that HOLDER and Sweet could communicate through their spouses' cellular telephones to avoid detection. Finally, Sweet suggested that HOLDER and Sweet use a code to communicate whereby Sweet would post a photo relating to a specified college football team on Instagram, following which they would each dial into Sweet's designated KPMG conference call line."

**The Government objects to the proposed change to the first sentence, because the trial testimony established that Holder was the one who suggested they use burner phones. (Tr. 1086). The Government proposes that the second, third, and fourth sentences read: "HOLDER and Sweet also discussed communicating through their spouses' cellular telephones to avoid detection. Finally HOLDER and Sweet discussed using a code to communicate. HOLDER and Sweet agreed that either one could communicate by posting a photo relating to a specified college football team on Instagram, following which they would each dial into a designated KPMG conference call number." (Tr. 1086-87).**

41-42. Ms. Holder has four objections to these paragraphs:

a. The PCAOB's estimated planning "costs" are not "losses" as that word is defined in the Sentencing Guidelines. According to U.S.S.G. §2B1.1, Application Note 3, "loss," either actual, intended or reasonably foreseeable, means "pecuniary harm." "Pecuniary harm," in turn, means harm that is "monetary or that otherwise is readily measurable in money." The PCAOB's estimated planning "costs" are derived from "employee pay and benefits" which the PCAOB would have paid to the pertinent employees whether or not the instant offenses were committed; it suffered no "pecuniary harm" in doing so. If a probation officer conducted an investigation and then prepared a PSR, but was then advised that the PSR was deficient and was required to be redone, and the officer prepared a new PSR, there would have been no "loss" to the Probation Department because the government would have paid no additional money to the probation officer, a salaried employee, for preparing the second PSR; the government would not have suffered any "pecuniary harm." The same logic applies here.

**This objection is meritless. Pursuant to 2B1.1 Application Note 3(A), loss is "the greater of actual loss or intended loss." Pursuant to 2B1.1 Application Note 3(A)(i), "actual loss" means the "reasonably foreseeable pecuniary harm that resulted from the offense." Pursuant to 2B1.1 Application Note 3(A)(iv), "reasonably foreseeable pecuniary harm" includes what a defendant "knew or, under the circumstances, reasonably should have known, was a potential result of the offense."**

**It is well-settled that a "court need only make a reasonable estimate of the loss." The planning costs for the misappropriated inspection lists are reasonable estimates of the value of the lists, and therefore reasonable estimates of the loss suffered by the PCAOB. U.S.S.G. 2B1.1 Application Note 3(C). The Guidelines provide clear examples of how loss may be calculated in a manner consistent with the approach taken by the Probation Office. For example, pursuant to subsection (v)(II) of the same Application Note, in a procurement fraud case, "reasonably foreseeable pecuniary harm" includes "the reasonably foreseeable administrative costs to the government and other participants of repeating or correcting the procurement action affected, plus any increased costs to procure the product or service involved that was reasonably foreseeable." Similarly, in connection with estimating loss in a trade secrets or other proprietary information case, the estimation of loss may consist of "the cost of developing that information . . ." U.S.S.G. § 2B1.1 Application Note 3(C)(ii). The Guidelines provide clear categories of costs to be excluded from, and credited against, the loss amount; none of them apply in this case. *See* U.S.S.G. § 2B1.1 Application Note 3(E).**

b. Even if the PCAOB's estimated planning "costs" were "losses" for purposes of § 2B 1.1, the total reported in the table in paragraph 41 of the PSR would be incorrect because it is based on double-counting. This is so because, absent the criminal conduct, the PCAOB would have, and did, plan and conduct the 2015, 2016, and 2017 inspections. The only "harm" would have been the additional estimated planning "costs" incurred in connection with the ten 2016 additional inspections and the re-planning/preparation for the 2017 inspections, which would have been caused by the criminal conduct. Put another way, it cannot be that the criminal conduct caused both the original planning costs and the replanning/preparation costs to be incurred.

**There was no double-counting. The planning costs for the original misappropriated inspection lists are used to estimate the value of the confidential property that was misappropriated. The additional costs incurred by the PCAOB to formulate replacement inspection lists is a pecuniary harm incurred by the PCAOB that was a reasonably foreseeable result of the offenses of conviction. This is consistent with the guidance, as discussed above, in U.S.S.G. § 2B1.1 Application Note 3(F)(v)(II), that loss in a procurement fraud case includes "the reasonably foreseeable administrative costs to the government and other participants of repeating or correcting the procurement action affected, plus any increased costs to procure the product or service involved that was reasonably foreseeable."**

c. Separately, Ms. Holder had nothing to do with Mr. Sweet's misappropriation of 2015 list while she was still employed at the PCAOB, did not know of it when Mr. Sweet took that list when he left the PCAOB in April 2015, and was not part of any discussions at KPMG about using it. As a result, unlike Messrs. Middendorf, Whittle and Britt, Ms. Holder was not charged in Count 3 of the Indictment (relating to the 2015 list). Accordingly, no amount of the 2015 estimated planning cost should be attributed to Ms. Holder.

In sum, the "loss" for purposes of the §2B 1.1 guidelines calculation is zero. Alternatively, the "loss" would be $865,445, which is the sum of the estimated cost for the 2016 ten additional inspections ($602,800) and the 2017 re-planning/preparation ($262,635).

**The Government agrees that Ms. Holder's loss should not include any loss from 2015.**

d. Lastly, there is reason to question the accuracy of the estimated amounts identified in paragraph 41 of the initial PSR. The government has not provided to Ms. Holder's counsel any documents supporting those estimated amounts, and we assume that such evidence has not been provided to the Probation Department. Nonetheless, at the Middendorf-Wada trial which ended two-and-a-half months ago, the government introduced evidence, including sworn testimony from PCAOB representatives, which "showed that in 2015 alone, it cost the PCAOB approximately $389,000 produce the KPMG inspection list. (Tr. 2175, 2182-83, 2197-220, 2381-83; GX 1371)." Government's May 17, 2019, Brief in Opposition to Defendants' [Middendorf and Wada] Motions for a Judgment of Acquittal or a New Trial, at 16. Yet now the PCAOB claims, without explanation, that it cost $623,470 to produce the 2015 inspection list, an increase of more than $233,000. In these circumstances, the estimates contained in paragraph 41 may not be reasonably reliable.

**Attached to this letter is a letter from the PCAOB setting forth its methodology for calculating loss.**

45. As indicated in more detail in paragraphs 34-38 above, Ms. Holder engaged in some, but not all of the conduct described in this paragraph when, along with Mr. Sweet, she took steps to cover up the true source of the confidential information she received from the PCAOB in 2016 and 2017. However, at the time Ms. Holder did so, no federal criminal investigation of the leaks had been initiated. In these circumstances, in order to receive a 2-level upward adjustment for obstruction of justice pursuant to U.S.S.G. §3C1.1, there must be evidence that Ms. Holder's actions were "purposefully calculated" to obstruct the investigation not yet initiated:

"Obstructive conduct that occurred prior to the start of the investigation of the instant offense[s] of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense[s] of conviction." Application Note 1, ¶2 ( emphasis added). Here, at the time Ms. Holder acted, she did not know or foresee that a federal investigation would begin and there is no evidence to the contrary; her reason for participating in the cover up was to protect Mr. Wada. Accordingly, although the Probation Department can consider Ms. Holder's conduct in arriving at an appropriate sentence recommendation, as a matter of sentencing guidelines calculation, there should not be a 2-level upward offense level adjustment for obstruction of justice in Ms. Holder's case.

**The Government objects to this change. Holder does not dispute that she took steps to destroy or hide evidence or to lie to KPMG's counsel in the internal investigation. Rather, Holder argues that the enhancement does not apply because she did not foresee that a federal investigation was coming. Holder is wrong. As a former FBI Agent, Holder had every reason to anticipate that efforts to defraud KPMG's regulator, and by extension, the SEC, would result in a criminal investigation. Indeed, in coaching Sweet to lie, Holder explicitly relied on her FBI training, claiming that she had pioneered the use of the "long pause" during her time as a law enforcement agent. Moreover, much of Holder's conduct makes sense _only_ in connection with efforts to thwart a Government (rather than internal) investigation. For example, Holder's suggestion that she and Sweet use burner phones or a Instagram code to avoid detection of their communications makes sense only in the context of a government**

investigation.  As a private entity, KPMG had no way to wiretap or listen-in on their private communications.  Nor did KPMG have anyway to ascertain whether they were in touch by means other than KPMG registered phones.  Thus, efforts to acquire burner phones or use codes make sense only if Holder was concerned about a possible Government investigation and her obstructive efforts themselves make clear that she was worried about this possibility. Accordingly, this enhancement is appropriate.

47. There are some errors in the transcription of the statement submitted by Ms. Holder into the PSR. Based on the statement as submitted, in the eighth paragraph, line 5, "2017" should be "2017"; on line 6, "During," should be "During"; and on line 9, footnote 3 should be footnote 1. In the footnote itself, on line 7, cholder@aol.com should be cholder21@aol.com (cholder@aol.com on line 6 is correct).

**The Government has no objection to these changes.**

49. As set forth in the government's Pimentel letter, Count 1 of the Indictment, conspiracy to defraud the United States, is not to be grouped together with Counts 2, 4 and 5, the wire fraud conspiracy and wire fraud counts in this case; it is its own, separate group. Count 1 charged a conspiracy to defraud the United States by interference with the function of the SEC, a government agency, and the government does not allege that the SEC suffered a "loss" as a result. Further, Count 1 did not charge a conspiracy to steal money from the SEC or to bribe an SEC official. U.S.S.G. §2Cl.1 is a broad guideline that applies not only to the conduct charged in Count 1 but also to bribery, extortion under color of official right and "honest services" fraud. But of the four specific offense characteristics identified in U.S.S.G. § 2C 1.1, only one, § 2Cl.l(b)(2), incorporates by reference the § 2B1.1 fraud loss table, and that is for acts of bribery and extortion, or where the government suffers a loss; the other §2C 1.1 (b) specific offense characteristics do not depend upon or reference a loss calculation. In addition, unlike the SEC, the PCAOB, the victim of Counts 2, 4 and 5, is not a government agency. In these circumstances, unlike Counts 2, 4 and 5, the offense level for Count 1 in this case is *not* "determined largely on the basis of the total amount of harm or loss." U.S.S.G. §3Dl.2(d). Further, Count 1, an obstruction-like offense, is not "of the same general type," *id.*, Application Note 6, as Counts 2, 4 and 5, which are fraud/theft offenses. *See generally United States v. Napoli*, 179 F.3d 1, 6-13 (2d Cir. 1999) (Sotomayor, J) (analysis of why money laundering is not to be grouped with wire fraud), *cert. denied*, 120 S. Ct. 1176 (2000). Thus, Count 1 is in Group 1 and Counts 2, 4 and 5 are in Group 2.

**Consistent with its *Pimentel* letter, the Government agrees that Count One is not grouped with Counts 2, 4, and 5.**

54. With respect to Ms. Holder's role in the offense, we submit that, pursuant to U.S.S.G. §3Bl .2(b), Ms. Holder was a "minor participant" in the offenses of conviction which should reduce her guidelines offense level by 2 levels. Pursuant to U.S.S.G. §3Bl.2, Application Note 3, and *United States v. Alston*, 899 F.3d 135, 149-50 & n.9 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1282 (2019), a defendant is to "be treated as having a 'minor role' in a crime for purposes of section 381.2(b) when [ s ]he 'is less culpable than most other participants in the criminal activity," that is, "by reference to his or her co-participants in the case at hand." *Alston*, 899 F.2d at 149 (citations omitted) (emphasis in original).

**This objection is frivolous and should be rejected. Holder played a critical role in the conspiracy, in that she was Wada's direct contact at the KPMG. She was the one who pumped Wada for confidential PCAOB information, and she shared it with Sweet at KPMG, knowing it would be put to use. And she did so repeatedly and over an extended prior of time. As a former PCAOB employee, Holder knew that disseminating the information was in direct violation of PCAOB's ethics code. Moreover, Holder did not just disseminate the information – she was actively involved in its use at KPMG. In particular, Holder was a direct participant in the stealth re-reviews KPMG conducted of banking inspections in 2016.**

50-60. Based on the objections expressed in paragraphs 41-42, 45, 49 and 54 above, the Offense Level Computation should be as follows:

**For the reasons discussed above, Holder's computation is inaccurate. The Government stands by the computation in its *Pimentel* letter.**

76, 80, 81, 83, 84, 85, 87, 99, 102, 106, 111 n.5, 111 n.7

**The Government has no objection to these changes.**

117. Please see the objections described at paragraphs 41-42, 45, 49 and 50-60 above. Based upon a total adjusted offense level of 10, the guideline imprisonment range is 6-12 months. However, an alternative non-custodial sentence is authorized by U.S.S.G. §5Bl.l(a)(2).

**Please see the Government's responses listed above.**

124. Please see the objections expressed at paragraphs 41-42, 45, 49 and 50-60 above. Since the applicable guideline range is in Zone B of the Sentencing Table, the defendant is eligible for probation. USSG § 5Bl.l(a)(2) and Application Note l(B).

**Please see the Government's responses listed above.**

126. Please see the objections expressed at paragraphs 41-42, 45, 49 and 50-60 above. Since the "loss" for counts 2, 4 and 5 is zero, the Alternative Fines Act does not apply and the maximum fine is $250,000 on each count. 18 U.S.C. §3571(b).

**For the reasons discussed above, the loss is not zero.**

128. Please see the objections expressed at paragraphs 41-42, 45, 49 and 50-60 above. Based on a total adjusted offense level of 10, the guidelines fine range is from $4,000 to $40,000. U.S.S.G. §5El.2(c)(3).

**Please see the Government's responses listed above.**

130-131. Based on the objections expressed at paragraphs 41-42, 45, 49 and 50-60 above, we submit that there should be no PCAOB restitution obligation imposed on Ms. Holder because

the "loss" is zero. Further, even if the PCAOB's estimated planning "costs" are "losses" for purposes of U.S.S.G. § 2Bl.1, restitution still should not be ordered because to do so would not compensate the PCAOB for "costs" it otherwise would not have incurred, but would instead result in a windfall for the PCAOB. Thus, having paid employee salaries and benefits it would have paid whether or not the defendants engaged in the charged criminal activity, the PCAOB has not suffered a loss of money for which restitution would be warranted. However, if the Probation Department concludes that there is a restitution amount other than zero, we ask that the Department recommend that the court apportion liability among all of the convicted defendants pursuant to 18 U.S.C. § 3664(h).

**As discussed in detail above, the loss amount is not zero. However, the PCAOB has chosen not to seek restitution for all losses in favor of a more limited request focused on the cost of creating the initial inspection lists.**

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by: _____ /s/ _____
Rebecca Mermelstein/Amanda Kramer/Jordan Estes
Assistant United States Attorneys
(212) 637-2360/2478/2543

cc: Counsel for Cynthia Holder (by email)