J89AHOLSps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4             v.                           18-cr-36-4 (JPO)

5   CYNTHIA HOLDER,

6             Defendant.                   Sentence

7   ------------------------------x

8                                   New York, N.Y.
                                    August 9, 2019
9                                   11:05 a.m.

10  Before:

11                     HON. J. PAUL OETKEN

12                                      District Judge

13
                          APPEARANCES
14
    GEOFFREY S. BERMAN
15       United States Attorney for the
         Southern District of New York
16  BY:  JORDAN ESTES, ESQ.
         Assistant United States Attorney
17
    THOMPSON HINE LLP
18       Attorneys for Defendant
    BY:  NORMAN A. BLOCH, ESQ.
19       EMILY J. MATHIEU, ESQ.

20
    Also Present:  Christopher O'Rourke
21                 Inspector, U.S. Postal Inspection Service

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

J89AHOLSps

1          (Case called)

2          THE CLERK:  Starting with the government, counsel,

3     please state your name for the record.

4          MS. ESTES:  Good morning, your Honor.  Jordan Estes

5     for the government.  And I'm joined at counsel table by

6     Christopher O'Rourke, an inspector with the United States

7     Postal Inspection Service.

8          THE COURT:  Good morning.

9          MR. BLOCH:  Norman Bloch and Emily Mathieu for

10    Ms. Holder.

11         THE COURT:  Good morning.

12         MR. BLOCH:  Good morning, your Honor.

13         THE COURT:  We're here for sentencing in this case.

14    Ms. Holder pleaded guilty on October 16, 2018 to the four

15    counts against her in the indictment: Count One, conspiracy to

16    defraud in the United States; Count Two, conspiracy to commit

17    wire fraud; and Counts Four and Five, which are wire fraud

18    counts.

19         I want to start by making sure I've reviewed

20    everything I should have in preparation for today.  I've

21    reviewed the presentence report, with an addendum and

22    sentencing recommendation by probation; submission by defense

23    counsel dated July 3rd, with several letters from the

24    defendant, as well as from family members and friends, all of

25    which I've read and certain other exhibits attached to the

J89AHOLSps

sentencing memorandum; submission by the government dated July

10; the victim impact statement by the PCAOB dated June 4.

I've also considered and reviewed the parties' filings

regarding the guidelines loss amount and restitution issues,

including Mr. Bloch's July 30 letter adopting Mr. Middendorf's

arguments on those issues, and the parties' arguments presented

at the August 1st hearing on those issues.

Do I have everything I should have?

MS. ESTES:  Yes, your Honor.

MR. BLOCH:  Yes, your Honor.

THE COURT:  Mr. Bloch, have you read the presentence

report and discussed it with Ms. Holder?

MR. BLOCH:  Yes.

THE COURT:  And, Ms. Holder, have you had a chance to

review the presentence report and discuss it with your lawyer?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Ands Ms. Estes, have you reviewed the

presentence report?

MS. ESTES:  Yes, your Honor.

THE COURT:  I know there are a number of guidelines

issues.  Putting aside the guidelines issues, are there any

objections or issues we need to address with respect to any of

the factual statements in the PSR?

MR. BLOCH:  Your Honor, with respect to paragraphs 34,

36, and 38 of the presentence report, those are paragraphs that

J89AHOLSps

1    relate to the cover-up that occurred at the end of the activity

2    in this case, and our difference with the PSR's

3    characterization, which adopts the government's, is that it

4    casts Ms. Holder as the controlling mind of the cover-up and

5    Mr. Sweet as her subject or doing whatever it is that she said

6    to do.  That's what Mr. Sweet testified at trial.  It wouldn't

7    be the first time, your Honor, that a cooperator has sought to

8    shift blame onto others for their activity.  And Ms. Holder

9    certainly doesn't deny that she participated in the cover-up,

10   that some of the things that happened were her idea.  Some of

11   the things were Mr. Sweet's idea.  Some of the things were

12   jointly decided.  So in the interests of, from our position, as

13   a matter of accuracy, those paragraphs are not accurate because

14   Ms. Holder disputes that it was she who thought up something as

15   opposed to Mr. Sweet.

16       Having said that, your Honor, I would suggest that we

17   just agree to disagree, because, in the end, since we certainly

18   admit participation in the cover-up, they're not really

19   significant factual disagreements.

20       THE COURT:  Did you want to add anything, Ms. Estes?

21       MS. ESTES:  No, your Honor.  That's fine.  I would say

22   that the paragraphs are based on sworn testimony that Mr. Sweet

23   provided and there's been no sort of sworn testimony to

24   contradict that.  But I think it's fine to agree to disagree in

25   this respect.

J89AHOLSps

1          THE COURT:  OK.  So it's not a formal objection to

2     change anything in the presentence report, but it's something

3     I'll take note of in terms of assessing the overall state of

4     affairs and culpability.  Is that fair?

5          MR. BLOCH:  Yes, your Honor.

6          THE COURT:  OK.  With that I'll deem that objection

7     sufficiently dealt with and not requiring a change in the

8     presentence report.

9          As a general matter, I adopt the facts set forth in

10     the presentence report as my findings of fact.  I'm obviously

11     relying on Ms. Holder's allocution at the plea hearing and also

12     the other information and evidence that I reviewed during the

13     course of the trial, co-defendants Mr. Middendorf and Mr. Wada.

14          And now let's turn to the sentencing guidelines.  I

15     believe there are just four issues in the guideline calculation

16     that the parties disagree with and in one respect disagree with

17     the Probation Department.  The sentencing guidelines are

18     important because, in every federal sentencing, we need to

19     start with an accurate calculation of the sentencing

20     guidelines.  They are no longer mandatory, so I am allowed to

21     go below or above the sentencing guidelines, but they are

22     legally required to be a starting point, or a benchmark, for

23     determining a sentence.  And they're incredibly complicated.  A

24     lot of things go into it.  You start with a base offense level

25     and you add or subtract points for various reasons, having to

J89AHOLSps

do with the seriousness of the offense and other related
issues, and then you put it up against the criminal history
category of a given defendant, which in this case, of course,
Ms. Holder has no criminal convictions in her life other than
this case.  And then you come up with a recommended guideline
range.

         So I want to address the issues.  And I'll let you --
well, I think, with respect to all of them but one, I think I'm
just prepared to rule, and if you want to say anything else on
the one, which is the obstruction of justice, I'll let you talk
about it.  The first one is, with respect to the grouping of
offenses -- and on that one I agree with both the defendant and
the government, contrary to the Probation Department, that
Count One is properly grouped separately from Counts Two, Four,
and Five.  Count One involves a conspiracy to defraud the
United States, specifically by interfering with a function of
the SEC, and does not involve a loss to the SEC, at least a
pecuniary loss, or economic loss.  The offense level for Count
One, unlike the other counts, is not "determined largely on the
basis of the total amount of harm or loss," as stated in
guidelines section 3D1.2(d).  Count One is in the nature of an
obstruction or interference type of offense, and therefore it
is not of the same type as the other counts, which are fraud or
theft type offenses.  And therefore I'm not grouping them
together, as the Probation Department does, but, rather, doing

J89AHOLSps

1    it the way the *Pimentel* letter in this case did.

2             Next is the loss amount.  We've had extensive

3    discussion about the loss amount, both in paper and at the

4    August 1st hearing, and I believe I'm prepared to rule on it.

5    Is there anything you need to add, Mr. Bloch?  I think there's

6    been plenty of paper shed on this.

7             MR. BLOCH:  Yes, your Honor.  I think there's nothing

8    else to be said on that point.

9             THE COURT:  OK.  And, Ms. Estes, anything else you

10   want to add on that?

11            MS. ESTES:  No, your Honor.

12            THE COURT:  All right.  The guidelines, specifically

13   Section 2B1.1, define loss as "reasonably foreseeable pecuniary

14   harm" from the offense.  "Pecuniary harm" in turn is defined as

15   "harm that is monetary or that otherwise is readily measurable

16   in money."  The Court need only make a reasonable estimate of

17   the loss.  That's under 2B1.1, comment 3C.

18            This case involved a misappropriation and use of

19   confidential PCAOB information, in particular its confidential

20   inspection lists, which were central to its regulatory

21   function.  As the Court has already held, this information was

22   property that had value.  And the defendant's misappropriation

23   and use of it caused actual harm to the PCAOB.

24            Now, admittedly it is not easy to quantify and measure

25   that harm.  Certainly the reputational harm to the PCAOB and

the harm to its regulatory mission are not easily measured.

But distinct from those harms was a harm to the PCAOB of the

actual loss from its confidential work product in developing

the lists to carry out its function.  Substantial time and

expertise of PCAOB personnel was wasted as a result of the

misappropriation and use of these confidential inspection

lists.  Although this was not an out-of-pocket loss to the

PCAOB, it clearly resulted in a diversion of resources in the

form of employee time.  And I find that, while that is not an

out-of-pocket monetary loss to the PCAOB, it is nevertheless an

economic loss and one that is reasonably measurable in money

for purposes of the guidelines.

          Now, the PCAOB has provided evidence that establishes

a basis for a reasonable estimate of this loss.  There are

development costs, which is an estimate of the employee costs

incurred by the PCAOB in developing the investigation lists.

And then there are response costs, which is an estimate of the

cost to the PCAOB of recreating the 2017 inspection lists and

the cost of additional reviews for 2016.  The government argues

that either of these provides a reasonable estimate of loss to

the PCAOB.

          I agree with the defendant that including both

development costs and response costs in the loss amount may

overstate the loss amount.  I find that the response-costs

measure provides the most reasonable estimate of the loss to

J89AHOLSps

the PCAOB.  These response costs reflect the most direct

measure of the wasted efforts of PCAOB personnel because they

represent the work that the PCAOB reasonably determined had to

be done to remediate the harm caused by the misappropriation

and use of the inspection lists.  While development costs are a

good measure in, for example, a trade secret case, the

confidential information here is further removed from the kind

of information that has value because of its marketable value,

and a better proxy for the loss here is the type of cost

described in the guidelines in analogous situations, the cost

to the victim entity of replacing the property, which is

mentioned in 2B1.1, application note 3(C)(i), or repairing

damaged property, which is at 3(C)(iii), or, as in government

procurement fraud cases, the cost to the government, including

specifically administrative costs, of repeating or correcting

the compromised procurement process.  And that's mentioned in

3(A)(v)(II).

With respect to the response costs, the PCAOB has

provided a reasonable estimate of its costs.  To create the

replacement inspection list for 2017, the estimated cost was

$262,613, and to conduct the ten additional reviews for 2016,

the cost was $567,228.  And that is described and supported at

Cook declaration, paragraph 11D and E, and the supporting

exhibits.

I am not persuaded by defendant's arguments that these

J89AHOLSps

 1    estimates are unreliable or inadequately supported.  All that

 2    is required for purposes of the guidelines is a reasonable

 3    estimate, and these are reasonable estimates.  In certain

 4    respects, in fact, they are conservative.

 5            Nor am I persuaded by defendant's argument that there

 6    was no loss to the PCAOB because these were salaried employees.

 7    As I've explained, this was an actual economic loss, in terms

 8    of the PCAOB's resources.  It is estimable and measurable.  A

 9    salaried employee's hourly rate, with a 1.25 multiplier to

10    account for overhead costs, is a reasonable measure for the

11    cost to the PCAOB of employing an individual.  This reasonable

12    estimate of loss under the sentencing guidelines is supported

13    by common sense and by the Second Circuit's decision in *United*

14    *States v. Burns*, 104 F.3d 529 (2d Cir. 1997).  Therefore, I

15    find that the reasonable estimate of loss to the PCAOB from the

16    defendant's criminal conduct is $829,863.  That is the total of

17    the response costs in conducting additional reviews for 2016

18    and recreating the inspection list for 2017.

19            The next disputed issue is minor role adjustment under

20    the guidelines.  I'm not persuaded by the defense argument that

21    she should receive a minor role adjustment.  It is clear from

22    the trial of Mr. Middendorf and Mr. Wada that Ms. Holder played

23    an important role in the offense.  She was Mr. Wada's direct

24    contact at KPMG, so she served as a critical conduit in passing

25    this information to KPMG, where she knew it would be used.  As

J89AHOLSps

a former PCAOB employee, she certainly knew that it was highly

confidential information, and she participated in some of the

re-reviews in which KPMG used the confidential information.

The last issue for guidelines purposes is obstruction

of justice points.  The issue with this -- I want to give

Mr. Bloch a chance to say anything else that you wanted to say

because the government has responded to your points by saying,

well, she talked about using burner phones, she talked about

communicating outside for KPMG communications, and none of that

really would be focused on an internal investigation but by

nature had to do with avoiding detection by the authorities.

So if there's anything you wanted to add on that, you may.

MR. BLOCH:  I do, your Honor.

With respect to that particular issue, at the time the

office of general counsel of KPMG had been asking on more than

one occasion for the cellphone records of Mr. Sweet and

Ms. Holder.  So it's not an idea that there's some sort of

wiretapping that they're concerned about by a criminal

investigation, but, rather, not having a record of their

cellphone communications on that particular point.

But more generally, your Honor, the government in its

response basically pointed to the idea that because Ms. Holder

had been an FBI agent for eight months more than 22 years ago,

that this somehow made it foreseeable for her that there would

be a criminal investigation, because that's what the

J89AHOLSps

guidelines, for purposes of the guidelines obstruction, it's

talking about purposely thwarting a criminal investigation.

And that just doesn't make any sense on the record.  It doesn't

make any sense as a matter of logic or common sense.  Whatever

Ms. Holder -- I mean, the cover-up itself, in looking back,

your Honor, I suggest it's almost comical to come up with a

preposterous story about the amount of e-mail, deleting things

that people know could be recovered.  It just doesn't make

sense that whatever Ms. Holder learned at a time in the 1990s,

in her brief time at the FBI, somehow informs her thinking that

there's going to be a federal criminal investigation.  And

indeed, your Honor, there was no federal criminal investigation

at the time that the conduct took place.  Nor was it foreseen.

I have to say, your Honor, I was representing Ms. Holder at the

beginning of March, and it certainly wasn't foreseen to me.

And the investigation didn't begin until mid April of 2017.  So

that linkage, your Honor, doesn't accord with common sense.

        Further, at the trial of Mr. Middendorf and Mr. Wada,

Brian Sweet was asked, what was your purpose in doing all this.

He said it was our purpose to protect Jeff Wada.  And

Ms. Holder and Mr. Sweet at that time were in frequent

communication.  They were talking about what was happening in

the internal investigation.  No one had said anything about a

criminal prospect in the future.  Indeed, KPMG ultimately

reported the misconduct, not to the Southern District of New

J89AHOLSps

```
1  │  York but to its regulators, the PCAOB and the SEC.
2  │         THE COURT:  But that was a federal regulator.  They
3  │  brought it up to the general counsel, who was a former federal
4  │  judge, and they immediately self-report to the PCAOB.  I mean,
5  │  I would think that the prospect of a federal investigation was
6  │  on people's minds.  No?
7  │         MR. BLOCH:  Well, your Honor, again, there's reality
8  │  and the guidelines.  The guidelines talk about a criminal
9  │  investigation.  I mean, obviously there's going to be an SEC
10 │  investigation, possibly a PCAOB investigation.  But my point is
11 │  that we're trying to figure out what was in Ms. Holder's mind
12 │  at that time.  And the only thing that I can point to is the
13 │  testimony of Mr. Sweet.  If they, Mr. Sweet or Ms. Holder, had
14 │  been contemplating a federal criminal investigation, that would
15 │  have been known to the government, would have been disclosed to
16 │  the defendant as being material, and would have been elicited
17 │  in testimony from Mr. Sweet that that's what their purpose was
18 │  in going through the machinations at the end of February 2017.
19 │         So, as a matter of evidence, it's not there as to what
20 │  their purpose was in doing this.
21 │         Now, again, your Honor, we're talking about the
22 │  guidelines.  The reality is, of course it was a cover-up, and
23 │  that still was their purpose, and it's certainly something the
24 │  Court can consider in terms of fashioning the appropriate
25 │  sentence.  The guideline purpose of adding the two points, I
```

J89AHOLSps

1    would submit, your Honor, the evidence is just not there.

2              THE COURT:  Ms. Estes, would you like to respond?

3              MS. ESTES:  Yes, your Honor.  First, I would note that

4    application note 1 to guideline 3C1.1 expressly states that the

5    obstructive conduct can happen prior to the start of the

6    investigation.  And that is just what happened here.  I mean,

7    what matters is that, as your Honor noted, it was very clear

8    this is the sort of thing that is going to be investigated by

9    regulators, by the SEC, by the PCAOB, ultimately by criminal

10   authorities.  And Ms. Holder and Mr. Sweet, whether or not they

11   were trying to protect Mr. Wada, they could be trying to

12   protect Mr. Wada in a lot of respects: in the internal

13   investigation, in an SEC investigations, in a criminal

14   investigation.

15             THE COURT:  Do you think that that guideline, it

16   applies only if it's more likely than not that the person was

17   thinking about a criminal investigation, or do you think that

18   that language in the application note covers a broader swath of

19   conduct, where there clearly was interference with an

20   investigation that became a criminal investigation?  Do they

21   have to know that it was likely to become one?

22             MS. ESTES:  Your Honor, I think all that matters is

23   that they willfully act to destroy evidence and do something in

24   some way to obstruct justice.  I mean, it's probably often not

25   in somebody's head immediately after they do something, like

J89AHOLSps

all of the many consequences that there may be.  The point is that Mr. Holder and Mr. Sweet were acting to avoid getting caught in what they knew was serious wrongful conduct that did lead to a criminal investigation.

I mean, I think here we have another reference to "willfully" in the guidelines here.  And we would submit that that just shows they knew they're choosing to obstruct justice, to willfully destroy evidence.  They're asking somebody to lie.  They're doing that knowing it's wrong to do that.  And that's what Ms. Holder and Mr. Sweet did.  And it was a natural consequence that that would affect a criminal investigation.

THE COURT:  OK.  I understand point of Mr. Bloch, but I do believe that under my reading of the guidelines, it does call for the two points for obstruction, because the defendant did take steps to destroy and hide evidence of this offense and to misstate certain facts to KPMG's counsel in its internal investigation, and also communicated with Mr. Sweet and arguably coached Mr. Sweet to misstate facts and to avoid detection.  I understand the argument that this was limited to the private internal investigation and did not extend to the federal criminal investigation.  However, I think that it is covered.  I mean, this is clearly an internal investigation that led to a criminal investigation.  It's all the same conduct we're talking about.  And I think in that way the attempt to destroy and hide evidence was willful obstruction in

J89AHOLSps

the sense that it was an attempt to hide evidence knowing that

such hiding was wrong.

I also think, as an alternative, that it's likely that

the prospect that a federal investigation would be coming is

something that people, including Ms. Holder, knew was a

significant possibility.

So I do add the two points.

So my ultimate guideline calculation -- and then I'll

give you a chance to speak overall to the 3553(a) factors --

the guideline calculation is, there are two separate groups.

Count One is group 1.  The base offense level for group 1 is

12, under Section 2C1.1(a)(2).  And that's a total offense

level of 12 for that group.  Group 2 is Counts Two, Four, and

Five grouped together.  And the base offense level is 7, under

2B1.1(a)(1) and 3D1.3(b).  Because the loss amount exceeded

$550,000, for the reasons I've discussed, the offense level is

increased 14 levels to 21, under 2B1.1(b)(1)(H), and the total

offense level is 21.  The combined offense level is 21, under

3D1.4(c), because group 1 is nine levels below group 2.  There

is an increase of two points for abuse of position of public or

private trust in a manner that significantly facilitated

commission or concealment of the offense under 3B1.3.  And

there's an increase of two points for obstruction, as I

mentioned.  So that results in 25.  And because the defendant

accepted responsibility and did so in a timely manner, there is

J89AHOLSps

1    a decrease of three points.

2            The total offense level is therefore 22.  And with a

3    criminal history category of I, because Ms. Holder has no prior

4    convictions, the guideline range is 41 months to 51 months'

5    imprisonment and a fine of 15,000 to 150,000 dollars.

6            Now, as I said, there's no mandatory minimum in this

7    case, so the 41 to 51 months' imprisonment is simply the

8    advisory guideline range and I need to consider that, but also

9    all the other factors in Section 3553(a), which I'll give the

10   parties a chance to talk about.

11           So you've all written submissions.  There have been

12   additional letters.  I've read everything.  But if there's

13   anything you would like to highlight today, I'll give you a

14   chance to do that, starting with Mr. Bloch.

15           MR. BLOCH:  Yes, your Honor.  I wanted to take the

16   opportunity to address several of the things in the

17   government's submission as well as to highlight several of the

18   factors that we talk about in our sentencing submission.

19           Your Honor, it would be easy to sentence if all the

20   factors pointed one way or the other.  And that didn't happen

21   here.  And so there are a lot of different things that I'm sure

22   the Court is taking into account in fashioning the appropriate

23   sentence.

24           With respect to what the government has submitted in

25   support of its request that the Court would impose a guideline

J89AHOLSps

1    sentence of 51 to 51 months, their submission essentially boils

2    down to four things:  First, the government points out that

3    this is an incredibly serious offense.  I'm not sure what the

4    difference between "incredibly serious" and "serious" is, but

5    there's no doubt and no one on this side of the courtroom has

6    sought to minimize the seriousness of the conduct here.  It is

7    a compromise of the PCAOB's inspection process.  Trust was

8    breached.  Confidentiality was compromised.  And as a

9    collateral consequence, many people's lives have been hurt by

10   all of that.

11            But, your Honor, we ask that you also take into

12   account the perspective that goes with this offense, especially

13   how it gets put through the guidelines calculation.  Whether or

14   not there's a loss is a matter of estimating economic loss.

15   The fact of the matter is, undisputed by the government, that

16   this was not financially motivated.  Money had nothing to do

17   with this offense, neither given, received, expected.  And in

18   that regard, your Honor, this offense is really almost unique

19   in what ordinarily comes through the courthouse doors.  This is

20   not a Ponzi scheme.  There are no individual victims,

21   vulnerable victims who have lost money.  It's not an insider

22   trading case where Ms. Holder profited using confidential

23   information.  None of that fits into this case.  And as we

24   mentioned or argued in our sentencing memorandum, it cannot be

25   that the offense conduct here, which your Honor has determined

J89AHOLSps

had a guidelines value, if you will, of over $800,000, that
that would be treated the same way as someone who actually
profited by stealing that kind of money from a vulnerable
victim or making it in an insider trading case.

So that, while serious, your Honor, doesn't justify --
we talk reality now or as 3553 factors are concerned -- a
lengthy, lengthy sentence, which is produced by the guidelines
analysis.

Second, your Honor, the government has suggested that
because Ms. Holder is a former FBI agent, that she somehow
should be held to a higher standard.  And I want to put again
that in perspective as well.  She was an agent for a total of
eight months, four months in training, four months in the
field, more than 22 years ago.  She's not accused of being a
corrupt agent.  She didn't reveal an informant in exchange for
money.  She didn't throw a case in exchange for money.  And the
notion that she should be held to a higher standard because she
had that position so many years ago is not logically connected
to what we are doing here today.

What is proper is that Ms. Holder should be held to
the standard that we all accept: her ethical standards as an
accountant and, particularly, the ethical rules about
confidentiality by the PCAOB.  Those are the standards that are
applicable.  And she breached them.  We're not here to say she
didn't.  But to add more on the negative side because she had

J89AHOLSps

been an agent, I submit, your Honor, you should reject that argument that the government has made.

Third, your Honor, the government says that this lengthy sentence should be imposed because it would promote general deterrence. And, your Honor, since last week, we've seen cases where judges have said, imposing a prison sentence for general deterrence, in particular with insider trading, which has gone on for 20 years -- it doesn't seem to have been deterred. And, your Honor, in this situation, recent studies and the National Institute of Justice, which is an arm of the Justice Department, have pointed out that what deters people from committing crime is certainty of apprehension, not lengthy punishment or incarceration. That is, it's the fear of getting caught that makes a difference.

And in addition, your Honor, in this particular case, we're talking to a relatively small universe of people. We're talking to accountants. The message should be that accountants should not be violating their ethical duties and responsibilities and disclosing confidential information inappropriately.

And in terms of promoting general deterrence, your Honor, there has been publicity here. We pointed it out in our memorandum. It's not simply in the *Wall Street Journal* or in *Bloomberg* or publications with widespread circulation, but particularly in the accounting profession, where one could be

J89AHOLSps

reasonably certain that people know about this case and know
about what can happen, and it's not simply the fear of being
sentenced to prison for over three years; it's losing your
license, losing your career, being punished by the SEC, in this
instance having a criminal record.  Nothing, nothing will be
added under general deterrence if this Court imposes a sentence
of imprisonment.

              And the fourth point that the government makes is that
there should be this guidelines sentence imposed because there
would be specific deterrence, that Ms. Holder will be deterred
from breaking the law in the future if she is sentenced to jail
for all those years.  Well, your Honor, I don't have as many
clients as you've sentenced while you've been on the bench, but
I would suggest to the Court that it would be hard pressed to
find another defendant who has appeared here who is less likely
to commit a crime in the future.  And indeed, when we talk
about the National Institute of Justice, they point out that
people like Ms. Holder, especially first-time offenders who go
to prison, actually learn more about how to be a criminal and
increase the rate of recidivism than if they were not exposed
to fellow prisoners in jail.

              So those are the four arguments basically that the
government has made as to why the guidelines sentence should be
imposed.

              Now, your Honor, on our side of the ledger, we have

J89AHOLSps

brought to the Court's attention a number of factors that are

mitigating and positive with respect to Ms. Holder.  And I only

want to highlight three of them right now.  The first, your

Honor, is Ms. Holder's cooperation.  And while we're not in a

situation where a defendant has gone down to have a proffer

with the government and for whatever reason the government

says, we don't want to have you signed up and become a

cooperating witness, and so counsel comes before the Court and

says, well, we tried -- that's not this case.  And the reason

it's not this case is because the government never asked,

twice, never accepted our offer to be even interviewed.  And

we're not here, your Honor, to debate that point.  The

government owes nobody an explanation as to why they chose to

proceed in the way they did.  And I'm not asking for one.  But

we are here to say that despite the government's position,

Ms. Holder engaged in a longterm, much longer, almost as long I

should say as the activity in this case, of being

cooperative -- being cooperative to the PCAOB, being

cooperative with KPMG, being cooperative with the U.S.

Attorney's Office -- without ever receiving or asking for a

promise from the U.S. Attorney's Office.

        Now, I want to point out, your Honor, two things in

particular, sort of the bookends of her cooperation.  The first

is that on March 17th of 2017, she voluntarily cooperated with

the PCAOB.  The PCAOB had called and asked to speak with her.

J89AHOLSps

1    And of all the players in this story, she is the only one who,

2    outside the PCAOB, who spoke to their counsel in connection

3    with their internal investigation.  And today, looking back, it

4    obviously was significant.  It was significant because

5    Ms. Holder, for the first time and only time as far as the

6    PCAOB is concerned, directly identified Mr. Wada as the source.

7    And at that time, there were questions about whether there were

8    other leads by other people or to other accounting firms, none

9    of which turned out to be the case.  But Ms. Holder was there

10   17 days after being put on administrative leave, after having

11   engaged in the cover-up that we talked about.  She turned

12   around right there.  And we did ask, your Honor, we asked the

13   PCAOB, before the interview took place, please tell Court about

14   the nature and quality of her cooperation.  And their outside

15   counsel has submitted a letter, which we attached, stating that

16   Ms. Holder provided material assistance to them.

17           That's the first thing, your Honor.  The other side of

18   the chronology had to do with iCloud data.  And that data

19   voluntarily was provided by Ms. Holder to the government in

20   November of 2017, months before there was the indictment --

21   again, without any promises.  And for whatever reason, the

22   government was delayed in analyzing it or being able to turn it

23   into visual material, whatever it was.  But it came time before

24   the trial, in January or February, January and February of '18,

25   when the government came to Ms. Holder and said, we want your

J89AHOLSps

1    help, we need your help, to understand the iCloud material.

2    And we detailed in our submission what was provided.  And, your

3    Honor, we sat through the trial.  I characterized that

4    evidence: the voicemail, the text messages.  ICloud was more

5    inclusive than what was on her phone which she voluntarily

6    provided.  The government has not denied, they admit that

7    everything she did, as far as her cooperation, as we reported

8    it in our sentencing memorandum, it was crucial, valuable

9    evidence.  It was used by the government in summation.  It was

10    introduced.  I mean, it was extremely helpful.

11           And, your Honor, that on one end, the cooperation with

12    the PCAOB at the other end, and things that happened in between

13    are significant factors.  I submit, your Honor, you do not see

14    many defendants come before you who voluntarily do all these

15    things without having a cooperation agreement with the

16    government.  And it is done here because Ms. Holder, not just

17    in a letter, in terms of accepting responsibility,

18    demonstrating remorse, and trying to rectify that which had

19    happened, was wrong and she can't take it back.  That's the

20    first factor, your Honor.

21           The second factor is the collection of cases that we

22    submitted to the Court having to do with similar defendants in

23    similar cases.  And that's in the category of there being

24    unwarranted disparities in sentencing.  And we provided the

25    Court with six cases, four of which are in the Southern

J89AHOLSps

District of New York, all of which involve theft of

confidential information from the Federal Reserve, which, for

the purposes of this proceeding, is very closely analogous.  In

many of those cases, all of them but one, the defendant was

permitted to plead to a misdemeanor.  In all of them, the

defendant received probation except one case.  And in one of

those cases, the defendant lied to the FBI, I believe, in the

investigation.

          The government has not denied that those are similar

cases.  And I would submit, your Honor, that to sentence

Ms. Holder to the incarceration of the guidelines

recommendation, let alone any incarceration, would create an

unwarranted disparity between Ms. Holder and those defendants.

Now, again, there's prosecutorial discretion as to who can do

what, where, and when.  But that's not what we're talking

about.  But the actual outcome in those cases, on facts that

are very similar, it would be unwarranted to treat Ms. Holder

more harshly than those defendants were treated.

          And third, your Honor, with respect to Ms. Holder's

history and character, what she does in her life, which is not

defined by this case, what happened here, long before this

case, she demonstrated over and over again her willingness to

put her interests above -- excuse me -- her willingness to put

others' interests above her.  She's provided time.  She's

provided money.  She's provided help to people she doesn't even

J89AHOLSps

1  know, let alone her friends and her family.  We've gone into

2  those things in detail, your Honor, in our sentencing

3  submission.  They are detailed in the letters that we have

4  submitted to the Court on Ms. Holder's behalf.  And many of

5  those people are here in the courtroom today: her wife, her

6  father, her stepfather, her brother.  Those friends, the people

7  who are close, those people -- I mean, if you heard it from an

8  individual, you would say, oh, no one could be this good, but

9  these people reported separately and over and over again how

10  altruistic and caring Ms. Holder is as a human being.  And,

11  your Honor, I submit that that factor counts for a lot when

12  we're before the Court for sentencing.

13         So for all those reasons, and also what we've

14  expressed in our sentencing memo, we do ask, as we did in the

15  memorandum, that the Court sentence Ms. Holder to probation

16  with community service.

17         Thank you.

18         THE COURT:  Thank you.

19         Ms. Estes.

20         MS. ESTES:  Yes, your Honor.

21         First, I want to address Mr. Bloch's point about the

22  other cases they cited in their sentencing memo. to be clear,

23  they're citing cases from around the country.  It's clear they

24  cherry-picked some cases where somebody was allowed to plead to

25  a misdemeanor and then they were sentenced to probation.

J89AHOLSps

That's simply not the case here.  This case should not be

considered in connection with a Northern District of Illinois

case from six years ago, where somebody merely transferred

confidential documents to his personal e-mail account, and from

Mr. Bloch's submission, those documents were never used by

anybody.  This is a different case.  Information was stolen

from the PCAOB, and it was given to KPMG so they could use it

and so they could undermined the inspection process.

         Now, I want to turn to Mr. Bloch's point about the

fact that Ms. Holder was an FBI agent and his argument that

we're trying to hold her to a higher standard.  Your Honor,

that's simply not the case.  The point of that is that

Ms. Holder was an FBI agent and she drew on her training as an

agent to help with the cover-up here.  She suggested they get

burner phones.  She suggested they use this Instagram code.

And she even coached Brian Sweet online in connection with the

internal investigation.  And when she did that, she drew on her

experience as an FBI agent.  I think Sweet testified that she

said, I invented the long pause, and she told him what to do if

there was a long pause.

         So, your Honor, that's why we submit that the fact

that she was an FBI agent is important here, is significant,

because she used that training to obstruct justice in this

case.

         Now, as to Mr. Bloch's point about deterrence, now,

J89AHOLSps

1  Mr. Bloch has said that the studies have shown that deterrence

2  is just a fear of getting caught.  But, your Honor, we would

3  submit that the fear of getting caught is meaningful because

4  there's a fear of jail time.  And he's asking for a

5  non-incarceratory sentence, an extraordinary sentence, when the

6  guidelines are 41 to 51 months.  And just to be clear, we're

7  not asking for an incredibly long sentence.  I think he cited

8  some studies that say that the length of the sentence isn't

9  what matters.  Our main point is that a sentence of

10  incarceration is appropriate, because if there was a

11  non-incarceratory sentence, that would really send a message

12  that this was not a serious crime, that you can get away with

13  defrauding regulators, with undermining a safeguard put in

14  place by Congress, the PCAOB and its inspection process.

15          And just to reiterate, your Honor, Ms. Holder was

16  deeply involved in this fraud.  She was a critical piece of

17  this case.  She was the one getting the information from Wada.

18  And that's what makes her conduct especially problematic.  Her

19  background in law enforcement only underscores how serious the

20  conduct is.

21          So we submit that a sentence of incarceration is

22  appropriate for deterrence, for KPMG and all the other auditing

23  firms, that they get a message that this kind of conduct will

24  not be tolerated.

25          THE COURT:  Is the government seeking forfeiture in

1   this case?  I know there's restitution.

2               MS. ESTES:  No forfeiture, your Honor.

3               THE COURT:  OK.  Thank you.

4               Ms. Holder, if there's anything you would like to

5   say -- I should say I've read your letter, which I found very

6   helpful.  If there's anything you would like to say today, you

7   may.  You are not required to, but you may.

8               THE DEFENDANT:  Yes, sir.  Is it OK if I read, your

9   Honor?

10              THE COURT:  Yes.

11              THE DEFENDANT:  Your Honor, I know I've already

12  written a letter to your Honor which expresses my thoughts and

13  feelings about my actions which bring me here today, but I want

14  to say to the PCAOB and KPMG that I'm sorry for the harm I

15  caused and that I was not worthy of the trust that they showed

16  me -- that they showed when they hired me.  I don't know that I

17  will ever forgive myself for my mistakes, which ruined

18  everything that I worked for and all that I've done with my

19  life.  I am deeply sorry.  And I wish I had made the right

20  decisions when I had the chance.  I also will forever regret

21  disappointing those who are closest to me.  I fully understand

22  that life will not allow me to go back and fix what I've done

23  wrong, but it will allow me to try and live each day better

24  than the last.  And that, your Honor, I will do.

25              I plead for the Court's mercy.  Please, your Honor, I

J89AHOLSps

1    beg the Court for the chance to continue to serve others in my

2    hometown and be there for my family members, including my

3    sister-in-law.  I feel that, through this, I will be able to

4    earn back my place in society and I hope, with time, my family

5    and others that I have hurt will forgive me.

6              Thank you, your Honor.

7              THE COURT:  Thank you.

8              Is there any reason why sentence may not be imposed at

9    this time?

10             MS. ESTES:  No, your Honor.

11             MR. BLOCH:  No, your Honor.

12             THE COURT:  In preparing to sentence the defendant,

13   I've considered the presentence report, the recommendation of

14   probation, the written and oral statements of defense counsel,

15   the defendant, and the government, and all the letters

16   submitted on behalf of the defendant.  I have also considered

17   all the factors set forth in statute 18 U.S.C. § 3553(a).  I

18   won't necessarily talk about all of them, but I've considered

19   all of them.  And importantly, in addition to the purposes of

20   sentencing, I'm required to consider the nature and

21   circumstances of the offense, and the defendant's history and

22   characteristics.

23             I should also say that the submission by defense

24   counsel was extraordinarily effective in this case, as was the

25   presentation today.

J89AHOLSps

1          I am required to impose a sentence that is sufficient

2    but not greater than necessary to comply with the sentencing

3    purposes in the statute.

4          The criminal conduct in this case was serious.  It was

5    serious because it involved the corruption of a regulatory

6    process, a process that was established by the Sarbanes-Oxley

7    Act to ensure that audits of public companies are done

8    accurately and independently.  The PCAOB was established by

9    Congress essentially as the meta auditor, the inspector of the

10   country's auditors or the auditor of the auditors.  Its

11   inspection process is supposed to function with independence

12   and integrity.  And that process was compromised by the

13   criminal conduct in this case.

14         This case was also serious simply because it involved

15   a misappropriation of a company's property.  It is different

16   from many fraud cases because it did not involve the taking of

17   money or tangible property.  Instead it involved the taking and

18   use of confidential information, the PCAOB's work product.  And

19   that was a serious crime with an actual loss.  The PCAOB

20   suffered the loss of hundreds of thousands of dollars in

21   employee time.

22         This case is also different because it did not involve

23   direct personal gain to the defendant.  Again, unlike many

24   other fraud cases that I see in this court, the defendant here

25   was not misappropriating property to line her pockets, at least

J89AHOLSps

1   not directly.  She was trying to help her employer, KPMG, do

2   better on inspections by its regulator.

3          In some respects, the fact that she was not motivated

4   by personal greed makes this defendant less culpable, less

5   blameworthy, than someone who simply steals from her employer,

6   or from someone else.  And that is something that I think I

7   properly should take into account and I do take into account.

8   At the same time, this crime is serious in some ways precisely

9   because it is more subtle than stealing money.  It involved a

10  corruption of a regulatory practice, a pattern of self-dealing,

11  essentially cheating, by employees of a regulated company to

12  give their company a leg up in the process.  And it is clear

13  that the defendant, as a recent PCAOB employee, knew that it

14  was wrong and knew why it was wrong.

15         So it's a strange case.  It's not like typical fraud

16  cases.  At the same time, I think it's a serious offense here.

17  Defendant makes a good argument about other cases and the

18  importance of considering similarly situated defendants.

19  However, when you look at those other cases, the nature of the

20  information that was taken is much less significant.  For

21  example, in one of the cases, the *Bansal* case, in the Southern

22  District, it involved a very small number of documents.  It was

23  a one-time event.  It was not something like the conduct here,

24  which involved documents and information taken over the course

25  of a long period of time under circumstances that clearly

J89AHOLSps

compromised a significant regulatory process of the PCAOB.  So

I think it's a much more serious crime than those involved in

the cases mentioned by defense counsel.

         I also need to consider the history and

characteristics of the defendant.  And I take seriously my

obligation to consider that.  The defendant here is someone who

clearly has many positive characteristics.  I'm fully persuaded

of that.  She's not only smart but she's worked extremely hard

in her life and in her career.  She's a thoughtful and

considerate and caring person, and she has positively affected

many people in mer life.  She has not had an easy life in a lot

of ways.  And I am taking all of that into consideration.

         It is also important to consider the fact that she

accepted responsibility and has expressed remorse for her

conduct.  I do not believe that this defendant poses any

significant risk of recidivism, and for that reason the

statutory purposes of specific deterrence and protecting the

public do not call for a guidelines sentence in this case.

         In addition, of course, the significant punishment

imposed by the mere fact of a conviction is punitive and is

significant.  In a case like this, the conviction alone will

have effects on the defendant's career and life.  Clearly the

fact of this case has had a very negative impact.  It's caused

significant amounts of stress on the defendant's life.

         These factors that I've mentioned lead me to conclude

J89AHOLSps

1   that a guidelines sentence would be greater than necessary.

2   However, at the same time, this is a case where the seriousness

3   of the offense and in particular the need for general

4   deterrence call for real punishment.  And for that reason I do

5   think that a sentence that includes incarceration is necessary

6   and appropriate here.

7           However, I am persuaded that a sentence significantly

8   below the guidelines, because of all of the balancing

9   counteracting factors that I've discussed, is warranted here.

10          Considering all this together, I have concluded a

11  sentence of a term of imprisonment of eight months is

12  sufficient but not greater than necessary to serve the purposes

13  of sentencing in the statute.  I intend to impose a sentence of

14  eight months' imprisonment and two years' supervised release.

15          Let me ask, counsel, if you have any objection you

16  would like to state or any legal reason that that sentence may

17  not be imposed.  Defense counsel?

18          MR. BLOCH:  No, your Honor.

19          THE COURT:  Government counsel?

20          MS. ESTES:  No, your Honor.

21          THE COURT:  Ms. Holder, would you please stand.

22          It is the judgment of this Court that you be committed

23  to the custody of the Bureau of Prisons for a period of eight

24  months.  Following release, you will be placed on supervised

25  release for two years, with the following conditions: you not

J89AHOLSps

commit another federal, state, or local crime; you not possess

or use an illegal controlled substance.  I am waiving the

mandatory drug testing condition because I find the defendant

poses a low risk of substance abuse.  You will cooperate in the

collection of DNA as directed by probation.

The standard conditions are imposed, with the

following special conditions:  you shall provide the probation

officer with access to any requested financial information.

You shall not incur any new credit charges or open additional

lines of credit without the approval of probation, unless

you're in compliance with the installment payment schedule.

You shall report to the nearest Probation Office within 72

hours of release.  And you'll be supervised by the district of

residence.

I am not imposing a fine, in light of the restitution

obligation.  Restitution will be ordered in an amount that I

will set at a later date after considering arguments about

possible allocation among defendants.

There is a mandatory $100 special assessment on each

count, so a total of $400, which is hereby imposed.

You will surrender to the facility designated by the

Bureau of Prisons on October 15, 2019, before 2 o'clock p.m.  I

am making a strong recommendation to the BOP that you be housed

at the Bryan FPC Federal Prison Camp in Bryan, Texas, to

facilitate family visitation.

J89AHOLSps

1          You have the right to appeal from your conviction and

2     sentencing except to the extent that you have waived that right

3     as part of your plea and plea agreement -- as part of your

4     plea.  There was no agreement.

5          If you are unable to pay the costs of appeal, you may

6     apply for leave to appeal in forma pauperis.  Any appeal must

7     be filed within 14 days of the filing of judgment.

8          And I am directing that a complete copy of the PSR be

9     provided to the BOP and the Sentencing Commission.  And the

10     Clerk will prepare the judgment.

11          Is there anything further?

12          MS. ESTES:  Your Honor, I think we would just that

13     your Honor make clear if it's eight months on each count

14     concurrent?  I just doesn't think that was clear.

15          THE COURT:  Yes.  Eight months on each of the four

16     counts to run concurrently, and also two years of supervised

17     release to run concurrently on all counts.

18          Thank you.

19          Is there anything further?

20          MR. BLOCH:  No, your Honor.

21          MS. ESTES:  No, your Honor.  Thank you.

22          THE COURT:  Thank you.  We are adjourned.

23          (Adjourned)

24

25